DEHAY & ELLISTON, LLP
William H. Armstrong, SBN 40650
Mahsa Kashani Tippins, SBN 242685
100 Pringle Avenue, Suite 700
Walnut Creek, California 94596
Telephone: (510) 433-1830
Facsimile: (866) 611-8690
E-mail: barmstrong@dehay.com
E-mail: mktippins@dehay.com

Attorneys for Defendant
Exxon Mobil Corporation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| DEBBIE L. VIALE, Individually and as Personal Representative of the Estate of RONALD VIALE, Deceased; and, AMBER JACOBS, an Individual,<br><br>Plaintiffs,<br><br>vs.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.,<br><br>Defendants. | No. 3:19-cv-00038-MMC<br><br>**EXXON MOBIL CORPORATION'S STATEMENT OF RECENT DECISION**<br><br>Judge: Hon. Maxine M. Chesney<br>Hearing: June 26, 2020<br>Time: 9:00 a.m. |

Pursuant to Civil Local Rule 7-3(d)(2), Defendant Exxon Mobil Corporation respectfully submits this Statement of Recent Decision to bring to the Court's attention the opinion of the California Court of Appeal, Second Appellate District, Division Eight, in *Sherry Horne, et al., v. Ahern Rentals, Inc.*, Case No. B299605, 2020 Cal.App. LEXIS 517, a true and correct copy of which is attached as Exhibit A.

The decision was filed on June 10, 2020 and Exxon Mobil Corporation's Reply in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment was filed on June 3, 2020 (*see* Dkt. No. 262).  The noticed hearing date for Exxon's Motion for Summary Judgment or, in the Alternative, Patrial Summary Judgment is set for June 26, 2020. The decision is therefore appropriate for consideration by the Court.  *See* Civil L.R. 7-3(d)(2). ("Before the noticed hearing date, counsel may bring to the Court's attention a relevant judicial opinion published after the date the opposition or reply was filed by filing and serving a Statement of Recent Decision, containing a citation to and providing a copy of the new opinion—without argument.")

DATED:  June 16, 2020                                             DEHAY & ELLISTON, LLP


By: /s/ Mahsa Kashani Tippins
Mahsa Kashani Tippins, CA SBN 242689
Attorneys for Defendant
Exxon Mobil Corporation

EXHIBIT A

# Horne v. Ahern Rentals, Inc.

Court of Appeal of California, Second Appellate District, Division Eight

June 10, 2020, Opinion Filed

B299605

**Reporter**
2020 Cal. App. LEXIS 517 *

SHERRY HORNE et al., Plaintiffs and Appellants, v. AHERN RENTALS, INC., Defendant and Respondent.

**Prior History: [*1]** APPEAL from a judgment of the Superior Court of Los Angeles County, No. BC675950, Lori Ann Fournier, Judge.

**Disposition:** Affirmed.

## California Compensation Headnotes/Summary

**Headnotes**

*Privette* Doctrine > Exceptions > Hirer's Retention of Control

**Court of Appeal, affirming trial court's summary judgment in defendant's favor, held that no triable issue of material fact existed as to whether exception to** *Privette v. Superior Court (1993) 5 Cal. 4th 689, 21 Cal. Rptr. 2d 72, 854 P.2d 721, 58 Cal. Comp. Cases 420*, **saved plaintiffs' negligence claim from summary judgment, when Court of Appeal found that decedent employee of independent contractor was killed while replacing tires on forklift belonging to defendant when forklift collapsed on top of him, that plaintiffs failed to present evidence that defendant affirmatively contributed to decedent's injuries under retained control exception to** *Privette* **set forth in** Hooker v. Department of Transportation (2002) 27 Cal. 4th 198, 115 Cal. Rptr. 2d 853, 38 P.3d 1081, 67 Cal. Comp. Cases 19, **and that "retained control exception" means hirer either actively directed contractor or contractor's employee or failed to undertake particular safety measure hirer had promised to do, neither of which was the case here.**

[See generally Hanna, Cal. Law of Emp. Inj. and Workers' Comp. 2d § 3.133; Rassp & Herlick, California Workers' Compensation Law, Ch. 12, § 12.16[8].]

**Counsel:** Ainbinder & Pratt, Colleen M. Pratt; Call & Jensen and David Sudger for Plaintiffs and Appellants.

Lynberg & Watkins, Michael J. Larin, Jerome P. Doctors; Sutton & Murphy and Michael S. Sutton for Defendant and Respondent.

**Judges:** Opinion by Grimes, J., with Bigelow, P. J., and Wiley, J., concurring.

**Opinion by:** Grimes, J.

## Opinion

**GRIMES, J.**—The family of an employee of an independent contractor sued the hirer of the independent contractor, alleging the hirer's negligence was a substantial factor in causing the employee's death. With some exceptions, such suits are barred by the *Privette* rule. (*Privette v. Superior Court (1993) 5 Cal.4th 689 [21 Cal. Rptr. 2d 72, 854 P.2d 721]* (*Privette*).) One of those exceptions is that a hirer is

liable for injury to an employee of a contractor if the hirer exercised control over safety conditions at the worksite in a way that affirmatively contributed to the employee's injuries. (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 [115 Cal. Rptr. 2d 853, 38 P.3d 1081] (*Hooker*).)

**(1)** Plaintiffs contend there are triable issues of fact whether defendant affirmatively contributed to the collapse of a forklift on the decedent while he was replacing its tires. We agree with the trial court that plaintiffs failed to present evidence that defendant **[*2]** affirmatively contributed to decedent's injuries under *Hooker*'s retained control exception to the *Privette* rule. Accordingly, we affirm the court's grant of summary judgment.

**FACTUAL AND LEGAL BACKGROUND**

1. *The Parties and Background Facts*

Plaintiffs are Sherry Horne, Rashawna Dickerson, Rashad Dickerson and Rashell Dickerson, the surviving heirs of Ruben Dickerson. Defendant is Ahern Rentals, Inc., a company that leases forklifts and other heavy-duty construction vehicles to its customers.

Mr. Dickerson's employer, 24-Hour Tire Service, Inc., provided tire repair and replacement services for defendant's equipment for nearly 10 years. Defendant was one of 24-Hour Tire's major customers. 24-Hour Tire is owned by Ronald Daetweiler, and his father, Steven Daetweiler, is the company's manager. 24-Hour Tire employed Mr. Dickerson as a tire changer and tire technician for more than 10 years.

On November 24, 2015, Mr. Dickerson was killed in an accident on defendant's premises while he was replacing the tires on one of defendant's forklifts. Mr. Dickerson was in the course and scope of his duties with 24-Hour Tire at the site of the accident. His surviving heirs were paid workers' compensation **[*3]** benefits by 24-Hour Tire's workers' compensation insurer.

2. *The Complaint and Answer*

Plaintiffs sued defendant, alleging a single cause of action for wrongful death. Plaintiffs' case rested on allegations that defendant negligently failed to provide a stable and level surface for the tire change, allowed the tire change to proceed with the forklift's boom raised, which caused the forklift to sway and collapse, and failed to properly train its employees and independent contractors to whom defendant assigned the maintenance and storage of the forklift.

Defendant denied liability and asserted as an affirmative defense that the complaint was barred by the rulings in *Privette* and its progeny.

3. *The Legal Background*

**(2)** Under *Privette*, when an employee of an independent contractor is injured while performing inherently dangerous work, and is subject to workers' compensation coverage, the employee cannot sue the person who hired the contractor to recover damages for the same injuries that were compensable under workers' compensation. (*Privette, supra, 5 Cal.4th at p. 702*.) The liability of the contractor, who is primarily responsible for on-the-job injuries to its employees, is limited by workers' compensation. The party who hired **[*4]** the contractor and who indirectly paid for the contractor's workers' compensation coverage through his payments to the contractor should likewise get the benefit of that coverage.

**(3)** There are several exceptions to the *Privette* rule. Plaintiffs invoke the *Hooker* exception in this case, arguing there are material disputes whether defendant exercised control over safety conditions at the worksite in a way that affirmatively contributed to Mr. Dickerson's injuries and death. (*Hooker, supra, 27 Cal.4th at p. 202*.)

The Supreme Court in *Hooker* found the trial court correctly granted summary judgment in favor of a hirer of a contractor whose employee was injured at the jobsite. *Hooker* held the hirer of an independent contractor is *not* liable to the contractor's employee "merely because the hirer retained control over safety conditions at a worksite," but only if "[the] hirer's exercise of retained control *affirmatively contributed* to the employee's injuries." (*Hooker, supra, 27 Cal.4th at p. 202*.) "Affirmative contribution" means either actively directing a contractor or contractor's employee, or failing to undertake a particular safety measure the hirer promised to do. (*Id. at p. 212, fn. 3*.)

In *Hooker*, Caltrans hired a general contractor to build a highway overpass. The contractor **[*5]** employed a crane operator. The crane with the outriggers extended was 18 feet wide and blocked other construction vehicles on the overpass, so the crane operator retracted the outriggers to let other vehicles pass. When the crane operator tried to swing the boom without first reextending the outriggers, the weight of the boom

caused the crane to tip over, killing him. (*Hooker, supra,* 27 Cal.4th at p. 202.) The Supreme Court found Caltrans did not affirmatively contribute to the operator's death because it *permitted* vehicles to use the overpass while the crane was being operated but did not *direct* the crane operator to retract the crane in order to allow the movement of traffic. (*Id.* at pp. 202, 214–215.)

There are other exceptions to *Privette* that do not apply to the facts in this case. We briefly mention two such exceptions, only because the parties cite the two cases in their briefs. A hirer of an independent contractor may be liable for providing unsafe equipment that affirmatively contributes to the injury of an employee of the contractor. (*McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225 [115 Cal. Rptr. 2d 868, 38 P.3d 1094].) Plaintiffs cite *McKown* but do not contend defendant provided unsafe equipment to 24-Hour Tire. A hirer also may be liable to a contractor's employee when the hirer knew or should have known of a [*6] concealed hazardous condition on the property, the contractor did not know about it, and the hirer did not warn the contractor about the condition. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 [36 Cal. Rptr. 3d 495, 123 P.3d 931].) Plaintiffs also cite *Kinsman* but do not allege any concealed hazardous condition. Since plaintiffs do not claim defendant provided unsafe equipment or that there was a concealed hazardous condition on the property, these cases are not applicable.

4. *Defendant's Evidence in Support of Summary Judgment*

In addition to the background facts described above, defendant produced the following evidence.

A few days before the accident, 24-Hour Tire arranged for another tire company to remove all four of the wheels and old tires on the forklift. Two employees of 24-Hour Tire used four jack stands to raise and support the weight of the forklift without any tires. These two employees of 24-Hour Tire had selected which jack stands to use from among those in defendant's forklift storage warehouse. The other tire company cut off the old tires, put new tires on the wheels, and delivered them to the jobsite on the afternoon before Mr. Dickerson was called to replace them on the forklift.

On the day of the accident, Steven Daetweiler was primarily in charge [*7] of directing the work. He did not examine the condition of the forklift as it sat on the jack stands before 24-Hour Tire began the work. He made no effort to determine if his employees had selected appropriate-capacity jack stands for the weight of the forklift.

Mr. Dickerson got under the forklift of his own volition. Ronald Daetweiler saw all of Mr. Dickerson's body go completely under the forklift. When asked if he did anything to figure out if the forklift was okay sitting on the jack stands before Mr. Dickerson went under it, Mr. Daetweiler said "Yeah, everything was fine." Mr. Daetweiler thought it was a safe practice for Mr. Dickerson to get completely under the forklift, "[b]ecause … that's how [Mr. Dickerson] always does it," and Mr. Daetweiler thought that is how it was supposed to be done.

Steven Daetweiler, who was in charge, did not see Mr. Dickerson get under the forklift and did not know he was going to get under the forklift. He knew it was not appropriate for Mr. Dickerson to put his entire body under the forklift, and only the arm and forearm should reach under the forklift.

It is necessary to lift the forklift up off each jack stand in order to slide the wheel with [*8] the new tire onto the axle hub, and this is done with a hydraulic air jack. Once the new tire is on the hub, and the lug nuts are tightened, the jack stand is removed, and the jack is slowly lowered down until the unit is sitting on the tire instead of the jack stand. Ronald Daetweiler saw Mr. Dickerson take the jack out of his truck, go under the forklift with it, connect the air hose to the jack, and jack it up. Mr. Daetweiler "waited for him to jack it up, and that's when it fell."

Steven Daetweiler testified there was "some unlevelness" in the asphalt surface under the forklift, but it did not cause him any concern about working on the forklift. He responded "yes" when asked, "Did you think that although there were some trivial disparities in the levelness of the asphalt surface, that overall it was essentially level?" He testified that he "analyzed the workspace before [he] started any work on that tire installation procedure"; he "knew and understood that if [he] thought there was anything unsafe about that location, that [he] could refuse to install tires on that lift at that place"; and he "made the determination that morning that the location of the lift was appropriate for [*9] [him] to do [his] work."

Steven Daetweiler was asked if he knew, in November 2015, "whether a forklift that had a boom elevated was more or less stable than a forklift that had the boom lowered," and he responded that "[i]t's probably a little bit more unstable." He believed that was the case

"[b]ecause … there's a little bit of weight up in the air," and "anything that sits low to the ground is more stable."

Defendant also submitted 24-Hour Tire's admission in response to defendant's request to admit that "prior to commencing its work on November 24, 2015, 24-Hour Tire Service, Inc. determined that it was appropriate to work on the [forklift], as it was parked, without any modifications being made."

Steven Daetweiler testified that defendant did not handle any of the tire changing and did not assist in performing any of the work. No one with 24-Hour Tire told defendant in advance what 24-Hour Tire planned to do. Mr. Daetweiler agreed the tire-changing procedure, including removing the old tires and wheels from the forklift, was "100 percent 24 Hour Tire work."

5. *Plaintiffs' Evidence in Opposition*

Plaintiffs' opposition evidence including the following.

The boom (or mast) on the forklift **[*10]** was in the raised position, as were the booms on all the other forklifts "per [defendant's] regular practices," on the day of the accident.

The manufacturer's operation and safety manual for the forklift instructs that the boom should be lowered when the forklift is in the parked position. Forklift safety videos provided to defendant's employees state the boom should be lowered when the forklift is parked. But defendant's employees were trained always to leave the boom raised when the forklifts were parked.

The service manual for the forklift states the first step of changing the tires on the forklift is to park it on a level surface, with the parking brake on, the ignition switch off, and the boom retracted and carriage lowered.

24-Hour Tire employees were not trained in the use of the forklift, and defendant did not train them on how to lower the boom or operate the forklift. Steven Daetweiler testified that defendant did not provide any training or safety documents or videos to anyone at 24-Hour Tire. He also testified he had no license to drive a forklift or any training on how to do so. He did not recall "anyone at [defendant] communicating the potential dangers of changing tires **[*11]** with the boom raised."

Juan Palacios, defendant's service manager, testified that defendant's practice is to leave the boom up prior to having a vendor replace the tires on the forklift; defendant does not "retract the boom and lower the carriage" as instructed in the service manual before a tire change; defendant does park on a level surface, set the travel lever to neutral, set the parking brake and turn off the ignition as stated in the manual.

Plaintiffs presented a declaration from Brad Avrit, a licensed civil engineer with expertise in accident reconstruction and safety engineering. He reviewed photographs of the premises and the forklift taken on the day of the accident; visually inspected (in 2019) the premises and the forklift that collapsed; and reviewed the operation and safety manual and the service manual for the forklift.

Mr. Avrit opined that defendant's act of parking the forklift "with the boom raised and on an uneven surface" was in conflict with the manuals; the forklift was parked on an uneven surface with its boom raised when it collapsed; and "[t]he raised boom on the Forklift, in combination with it being parked on an uneven surface, were substantial factors causing **[*12]** the Forklift to collapse onto Decedent."

Mr. Avrit opined that with a lowered boom, the forklift's center of gravity "changes radically" from that of a raised boom, and that the uneven surface of the ground where the forklift was staged "significantly increases and/or amplifies the effect of movement and/or displacement of the forklift due to the extended boom. Due to the uneven and/or sloped surface of the ground, any movement or displacement of the forklift with the extended boom, would drastically cause the forklift to become unbalanced and/or shift in movement. A lowered boom will result in the Forklift being much more stable and unlikely to tip because the center of gravity is shifted towards the center of the forklift rather than forward where the weight of the raised boom sits."

6. *The Trial Court's Decision*

The court granted defendant's motion for summary judgment. The court found there was sufficient evidence to show that defendant retained control over the worksite, but no evidence to show the existence of a triable issue of fact pertaining to defendant's affirmative contribution to Mr. Dickerson's injuries. The court found it was undisputed that defendant did not interfere **[*13]** with or direct Mr. Dickerson on how the work should be done or how safety procedures should be implemented.

The trial court issued its ruling on July 15, 2019, and plaintiffs filed a notice of appeal on July 31, 2019.

**DISCUSSION**

We agree with the trial court that the evidence shows no triable issue of material fact, and defendant was entitled to summary judgment.

1. *The Standard of Review*

A defendant moving for summary judgment must show "that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action." (*Code Civ. Proc., § 437c, subd. (p)(2)*.) Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id., subd. (c)*.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was "'to liberalize the granting of [summary judgment] motions.'" (*Perry v. Bakewell Hawthorne, LLC (2017) 2 Cal.5th 536, 542 [213 Cal. Rptr. 3d 764, 389 P.3d 1]*.) It is no longer called a "disfavored" remedy. (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*) On appeal, "we take the facts **[*14]** from the record that was before the trial court. … '"We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."'" (*Yanowitz v. L'Oreal USA, Inc. (2005) 36 Cal.4th 1028, 1037 [32 Cal. Rptr. 3d 436, 116 P.3d 1123]*, citation omitted.)

2. *The Governing Principles*

We have already described the general contours of the *Privette* principles (see pt. 3 of the factual and legal background, *ante*). The issue here is the applicability of the *Hooker* principle that a hirer may be liable for injury to an employee of a contractor if the hirer's exercise of retained control over safety conditions at the worksite affirmatively contributed to the employee's injuries.

**(4)** We begin our discussion with one other explanatory principle. "The *Privette* line of decisions … establishes that an independent contractor's hirer presumptively delegates to that contractor its tort law duty to provide a safe workplace for the contractor's employees." (*SeaBright Ins. Co. v. US Airways, Inc. (2011) 52 Cal.4th 590, 600 [129 Cal. Rptr. 3d 601, 258 P.3d 737]*.) This *Privette* presumption affects the burden of producing evidence. (*Alvarez v. Seaside Transportation Services LLC (2017) 13 Cal.App.5th 635, 642 [221 Cal. Rptr. 3d 119]* (*Alvarez*).)

Here, as in *Alvarez*, "defendants provided the requisite factual foundation for the *Privette* presumption to apply." (*Alvarez, supra, 13 Cal.App.5th at p. 644*.) Defendant presented evidence that it "hired **[*15]** plaintiff's employer to perform work" at defendant's premises, and that "plaintiff was injured while working at the site." (*Ibid.*) "This evidence was sufficient to establish that the *Privette* presumption applied and, therefore, shifted the burden to plaintiff to raise a triable issue of fact." (*Alvarez, at p. 644*.)

3. *There Is No Evidence Defendant Affirmatively Contributed To Mr. Dickerson's Injury and Death*

Plaintiffs say defendant retained control over the safety conditions of the forklift by performing the initial set-up for tire service and because only defendant was lawfully permitted to operate the forklift. They say 24-Hour Tire was not qualified to re-park the forklift or lower the boom, and their employees were not trained to know whether the forklift had been shut down properly.

**(5)** As a matter of law, these facts do not show defendant "*exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Hooker, supra, 27 Cal.4th at p. 210*.) A hirer like defendant may be liable for injury to an employee of a contractor only if the hirer actively directs the contractor or contractor's employee to do the work in a particular way or fails to undertake a particular safety measure **[*16]** the hirer promised to do. There is no such evidence in this case.

Passively permitting an unsafe condition does not amount to actively contributing to how the job is done. (*Tverberg v. Fillner Construction, Inc. (2012) 202 Cal.App.4th 1439, 1446 [136 Cal. Rptr. 3d 521]* (*Tverberg*) ["passively permitting an unsafe condition to occur *rather than directing it to occur* does not constitute affirmative contribution," italics added, citing *Hooker, supra, 27 Cal.4th at pp. 214–215*].) "The failure to institute specific safety measures is not actionable unless there is some evidence that the hirer … had agreed to implement these measures." (*Tverberg, at p. 1446*; see also *Khosh v. Staples Construction Co, Inc. (2016) 4 Cal.App.5th 712, 718 [208 Cal. Rptr. 3d 699]* ["A hirer's failure to correct an unsafe condition, by itself, does not establish an affirmative contribution."].)

In *Tverberg*, the hirer actively contributed to unsafe conditions at the jobsite that caused the plaintiff's injury. The plaintiff was an independent contractor who was injured when he fell into one of eight holes that had been dug by another independent contractor under the

defendant's directions. Each hole was four feet wide and four feet deep. The holes had no connection with the plaintiff's work but the plaintiff was hired to work right next to them. The plaintiff asked the defendant's lead man to cover the holes with large metal plates that were onsite, but the [*17] lead man said the necessary equipment was not available that day. When the plaintiff returned to work the next day, the holes were still uncovered. He again asked the lead man to cover the holes, but nothing was done. (*Tverberg, supra, 202 Cal.App.4th at pp. 1442–1443*.) The facts that the defendant in *Tverberg* did not cover deep holes that it directed another contractor to dig right next to where the plaintiff was performing his work created a material factual dispute as to whether the defendant affirmatively contributed to the plaintiff's injury. (*Id. at pp. 1447–1448*.)

Other courts have affirmed summary judgment for the defense when the undisputed evidence showed the defendant-hirer did not direct, participate in, or interfere with the way the work was done or agree to implement any safety measure. In *Brannan v. Lathrop Construction Associates, Inc. (2012) 206 Cal.App.4th 1170 [142 Cal. Rptr. 3d 336]* (*Brannan*) the court affirmed summary judgment for the hirer of a subcontractor whose employee was injured at a construction site. In *Brannan*, the general contractor hired a masonry subcontractor that employed the plaintiff bricklayer. The general contractor's project manager told the masonry subcontractor he would do the plastering first and remove the plaster scaffold before starting the masonry work. But the scaffold was still there when the masonry [*18] work began. The masonry foreman believed his crews could work around the plaster scaffold, and he had no safety concerns about them stepping onto the scaffold rungs to get to the other side. The plaintiff was injured when he slipped and fell on wet scaffolding. (*Id. at pp. 1173–1174*.) He alleged his injuries were caused by the general contractor's negligence in sequencing and coordinating construction work at the site, and failing to call a " 'rain day' " to protect workers from dangerous conditions caused by slippery surfaces. (*Id. at pp. 1172–1173*.)

In affirming summary judgment for the defendant, the *Brannan* court reasoned it was undisputed the general contractor did not direct the plaintiff's work and did not tell him to gain access under the plaster scaffold the way he did. There was no evidence the general contractor knew that the plaintiff or other masonry employees were climbing over the scaffolding in the manner they did, or that this practice posed a safety hazard. The masonry subcontractor's own foreman, who did know about the practice and was responsible for the safety of his employees, stated he had no safety concerns about it. (*Brannan, supra, 206 Cal.App.4th at pp. 1178–1179*.) "[The general contractor's] act of allowing the scaffolding to remain in place [*19] while the masonry work proceeded was no more an exercise of retained control over safety than was Caltrans's decision in *Hooker* to allow construction traffic to access the overpass while the crane was being used." (*Brannan, at p. 1180*.) The court explained, "This would be a different case if [the masonry subcontractor's] foreman or one of its employees had asked [the general contractor] to remove the scaffolding for safety reasons, [the general contractor] had promised to do so, and then it negligently failed to follow through." (*Ibid.*)

This, too, would be a different case if 24-Hour Tire or one of its employees had asked defendant to take safety measures to be sure the forklift was stable, and defendant promised to do so, but did not follow through. There is no evidence that defendant ever agreed with 24-Hour Tire to implement any safety measure related to the position of the forklift (or any other safety measure). There is no evidence anyone with 24-Hour Tire asked defendant to move the forklift or lower the boom, but defendant did not do so; or that it was impossible or impractical to ask defendant to be sure the forklift was safely positioned to change the tires.

The undisputed facts are quite the [*20] opposite. Plaintiffs produced evidence that defendant did not train 24-Hour Tire employees on how to service the forklift. Plaintiffs also produced evidence that it was the normal practice of 24-Hour Tire to use defendant's jack stands when working on defendant's forklifts without signing them out for use, and defendant did not direct 24-Hour Tire which jacks to use. Steven Daetweiler knew the forklift was parked on uneven ground, and that it was less stable with the boom raised than it would have been with the boom lowered. He analyzed the workspace before the work began on the tire installation. He knew he could refuse to install the tires on the spot where the forklift was parked if he thought there was anything unsafe about that location. He was the one who made the decision that the location of the forklift was appropriate for him to do the work.

The facts that only defendant had keys to the forklift and the authority to move it do not show defendant affirmatively contributed to how the job was done. At most, plaintiffs' evidence shows defendant passively permitted an unsafe condition. Other courts have

affirmed summary judgment for the defendant-hirer of a contractor where the [*21] evidence showed the defendant passively permitted an unsafe condition. (See, e.g., Madden v. Summit View, Inc. (2008) 165 Cal.App.4th 1267, 1276–1277 [81 Cal. Rptr. 3d 601] [hirer not liable for injury to subcontractor's employee who fell from a raised patio at a construction site, where there was no evidence hirer directed there be no guardrail, did anything to prevent installation of guardrail, discussed placing safety railing along the patio, or became aware of any safety concern due to lack of such railing]; Michael v. Denbeste Transportation, Inc. (2006) 137 Cal.App.4th 1082, 1096–1097 [40 Cal. Rptr. 3d 777] [hirers not liable for failure to provide fall protection to trucker who fell while working for hazardous waste disposal subcontractor, where there was no evidence hirers promised to undertake any particular safety measures or intervened in the subcontractor's working methods]; Lopez v. C.G.M. Development, Inc. (2002) 101 Cal.App.4th 430, 446 [124 Cal. Rptr. 2d 227] [hirer not liable to employee of roofing subcontractor who fell from the roof when not wearing a harness or any safety equipment, where hirer told subcontractor to provide its employees safety equipment, subcontractor provided harnesses and instructed his employees to wear them, and hirer did not know of any safety hazard]; cf. Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1345–1346 [26 Cal. Rptr. 3d 433] [hirer may be liable to contractor's employee by furnishing and abruptly withdrawing safety equipment, leaving the plaintiff with no safe means of completing the [*22] work].)

There is no evidence of any basis for liability in this case, and the trial court properly entered summary judgment.

**DISPOSITION**

The judgment is affirmed. Defendant shall recover its costs on appeal.

Bigelow, P. J., and Wiley, J., concurred.

---

End of Document

# PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

*Debbie L. Viale, et al., vs. Air & Liquid Systems Corporation, et al.*
United States District Court No. 3:19-cv-00038-MMC

I, Beth D. Self, declare that am, and was at the time of service of the document herein referred to, over 18 years of age, not a party to this action and a citizen of the United States. I am employed in the County of Contra Costa, California by DeHay & Elliston, LLP and my work email address is bself@dehay.com and my work mailing address is 100 Pringle Avenue, Suite 700, Walnut Creek, California 94596.

On June 16, 2020, I electronically served the following document via CM/ECF by filing and electronically serving the document mentioned below, via CM/ECF system, to Plaintiffs' counsel and to the recipients designated on the Transaction Receipt located on the CM/ECF website:

**DEFENDANT EXXON MOBIL CORPORATION'S
STATEMENT OF RECENT DECISION**

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on June 16, 2020, at Fairfield, California.

*/s/ Beth D. Self*
Beth D. Self